UNITED STATES of America, Plaintiff,

v.

CONSERVATION CHEMICAL
COMPANY, et al., Defendants
and Third-Party Plaintiffs,

v.

GENERAL DYNAMICS CORPORA-
TION, et al., Third-Party
Defendants.

No. 82–0983–CV–W–5.

United States District Court,
W.D. Missouri, W.D.

April 28, 1987.

See also 653 F.Supp. 152.

Niewald, Waldeck, Norris & Brown, Michael E. Waldeck, John L. Hayob, Terry L. Karnaze, Kansas City, Mo., for Conservation Chemical, CCC of Ill. and Norman Hjersted.

Thos. F. Fisher, John M. Kilroy, Jr., Shughart, Thomson & Kilroy, Kansas City, Mo., Edmund B. Frost, John A. Zackrison, Kirkland & Ellis, Washington, D.C., Robert F. St. Aubin, FMC Corp., Philadelphia, Pa., for FMC Corp.

Neil D. Williams, Overland Park, Kan., James F. Duncan, Watson, Ess, Marshall & Enggas, Kansas City, Mo., Allan J. Topol, Patricia A. Barald, David F. Williams, Covington & Burling, Washington, D.C., for IBM Corp.

Richard F. Adams, Ben R. Swank, Jr., John J. Williams, III, Slagle & Bernard, Kansas City, Mo., for third party plaintiffs.

Linde Thomson Fairchild Langworthy Kohn & Van Dyke, P.C., John R. Cleary, Darwin Johnson, Wm. Session and Robert J. Bjerg, Kansas City, Mo., for Norman Hjersted.

J. Jeffrey McNealey, Porter, Wright, Morris & Arthur, Columbus, Ohio, Martin J. Purcell, Robert M. Kroenert, Stanley A. Reigel, Morrison, Hecker, Curtis, Kuder & Parrish, Kansas City, Mo., Daniel W. Kemp, Legal Dept., Armco, Inc., Middleton, Ohio, for Armco, Inc.

Jerome T. Wolf, Carl H. Helmstetter, Spencer, Fane, Britt & Browne, Kansas City, Mo., John A. McKinney, Morton I. Zeidman, Alan R. Chesler, New York City, for AT & T Tech. Inc.

Stephen Jacobson, Lathrop, Koontz, Righter, Clagett & Norquist, Kansas City, Mo., for Mobay.

Kenneth Josephson, Asst. U.S. Atty., Kansas City, Mo., John R. Barker, Environmental Enforcement Section, Land Natural Resource Div., U.S. Dept. of Justice, Washington, D.C., Ken Weinfurt, Asst. U.S. Atty., Kansas City, Mo., John Wittenborn, Environmental Defense Section, Land and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff.

## ORDER

SCOTT O. WRIGHT, Chief Judge.

On April 17, 1987, the Special Master filed recommendations concerning the motion of the United States to enforce the Preliminary Agreement between the United States and the Original Generator Defendants. The Special Master also filed recommendations concerning the Court's jurisdiction to proceed with the CERCLA Section 106(a) action. As required, the Court has independently reviewed the record regarding the issues relating to the Master's report, including the Government's motion and responses thereto, as well as the Government's objections filed to the report. *See United States v. Louisiana,* 470 U.S. 93, 105 S.Ct. 1074, 1080 84 L.Ed.2d 73 (1985).

The Court fully concurs with the Master's recommendation that the remedy provisions of the Preliminary Agreement can-not be construed as a partial consent decree, "functional or otherwise" and that even assuming a contract exists, the conditions precedent to the Original Generator Defendants' performance have not occurred, and performance therefore is not due. Further, the Court finds that the 1986 Amendments to CERCLA (SAPA) do not divest federal district courts of equity jurisdiction in CERCLA Section 106(a) actions, and that the Court will exercise its equitable powers to determine the appropriate remedy for the CCC site.

Accordingly, it is hereby

ORDERED that the Special Master's Recommendation that the Motion of the United States to Enforce the Preliminary Agreement be denied, is approved and adopted by the Court.

## SPECIAL MASTER'S RECOMMENDATIONS ON MOTION OF UNITED STATES TO ENFORCE PRELIMINARY AGREEMENT

ROBERT H. FREILICH, Special Master.

### INTRODUCTION

During proceedings before the Special Master on February 17, 1987, the Special Master asked that *motions* and briefs [1] be filed with respect to various substantive and procedural issues "so that we know what is the relief you are asking." (Transcript of Proceedings, p. 32; *see also,* pp. 16, 20–21, 46 and 50).

On February 18, 1987, the Special Master issued his 30th Set of Recommendations Concerning Pretrial Matters.[2] Under the third section, six issues likely to be raised *via* the anticipated *motions* were listed and the parties were invited to file motions and to brief each issue. Except for the United States' motion relating to enforcement of the Preliminary Agreement, no other motions have been filed, although the parties [3] have filed extensive briefs and memoranda

---

1. To date, the only motion filed has been that of the United States to enforce the Preliminary Agreement. The Special Master is not aware of any other motions currently pending before the Court concerning these issues.

2. Approved by Order of the Court on February 24, 1987.

3. United States, IBM, FMC Corporation, AT & T Technologies, Inc., Armco, Inc. and Midland-Ross Corporation.

of law addressing each of the six procedural issues.[4]

Some of the matters addressed in the briefs and memoranda are useful in settling the legal predicate for further actions, and to that degree they will be discussed. Issues and matters which are unnecessary because of this Recommendation as well as those not properly framed or not yet properly before the Court will not be addressed.[5]

## I. PENDING MOTION.

Pending is the United States' (hereinafter "the government" or "plaintiff") Motion[6] to Enforce the Preliminary Agreement Between the United States and the Original Generator Defendants.[7]

To support its motion, the government principally relies on two arguments. First, it argues that the Preliminary Agreement is a binding contract between the government and the Original Generator Defendants which requires performance absent facts justifying modification or recession.

Secondly, the government argues that the Preliminary Agreement is "functionally a partial consent decree," for the reason that the portion of the Agreement relating to the remedy was consented to by the parties and approved by an order of the court and brings finality to that portion of the case dealing with the remedy. (United States' Memorandum, p. 11). Under its interpretation, the government relies on Rule 60(b), Fed.R.Civ.P., to obtain relief in enforcing the Preliminary Agreement and the Court's order in approving it.

In opposition to the motion, the Original Generator Defendants argue that specific performance will not lie against them because there is an adequate remedy at law, because performance would be impossible, and because conditions precedent to their obligations have not been met. Similarly, they contend that the Preliminary Agreement is not a consent decree, but that if it is, it should be modified under Rule 60(b) because the Rule allows for modification where prospective application of the judg-

---

**4.** The first listed issue relates directly to the motion filed by the United States, *i.e.,* are the parties and the Court bound by the remedy proposed by the Preliminary Agreement and approved by the Court? The second question pertains to the Court's jurisdiction and the method to be used to determine a remedy under CERCLA/SARA and RCRA. The third through sixth issues relate to the procedure to be followed under the various methods to determine a remedy.

**5.** The oldest and most consistent thread in the federal law of justiciability is that federal courts will not give advisory opinions. *See, e.g., FCC v. Pacifica Foundation,* 438 U.S. 726, 734–735, 98 S.Ct. 3026, 3032–3033, 57 L.Ed.2d 1073 (1978); *Hales v. Green Colonial, Inc.,* 490 F.2d 1015, 1017 n. 3 (8th Cir.1974). *See generally,* 13 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3529.1 (2d ed. 1984). The Special Master likewise declines to offer recommendations on matters not properly raised by the parties.

**6.** The government's motion cites Rule 60(b), Fed.R.Civ.P. for its authority. In its Reply to the Response of the Original Generator Defendants and Midland-Ross, the government, for the first time, contends that its motion is really one for summary judgment under Rule 56, Fed.R. Civ.P. (Reply, p. 7), and appends a four-page affidavit. The Special Master knows of no method by which a party can transform a motion under Rule 60(b) into one for summary judgment by the simple expedient of calling it a

summary motion. Having filed and briefed its motion as one under Rule 60(b), it will be decided under Rule 60(b).

The Special Master has some reservations as to whether motion practice is the proper vehicle to bring enforcement of the Preliminary Agreement before the Court. Certainly an independent action for breach of contract or declaratory judgment would be appropriate to determine the rights of the parties under the Preliminary Agreement. *See,* 28 U.S.C. § 2201 (The Declaratory Judgment Act) and Rule 57, Fed.R.Civ.P. *See also, Wagner v. Simon,* 412 F.Supp. 426 (W.D.Mo.1974) *aff'd* 534 F.2d 833 (8th Cir.1976) (purpose of Declaratory Judgment Act is to afford remedy to one who is uncertain of his rights and desire adjudication without having to wait until his adversary decides to bring suit); *New York Life Ins. Co. v. London,* 15 F.Supp. 586 (D.Mass.1936) (if existence of a contract is in controversy between the parties thereto, the court is empowered to inquire whether there are any legal relations and what those relations are). Since the Original Generator Defendants do not specifically raise the question of the Court's jurisdiction to determine this matter or whether an independent, plenary proceeding is required, in the interest of justice and to obtain speedy and certain relief in this protracted proceeding, the matter will be accepted for decision.

**7.** IBM, FMC Corporation, AT & T Technologies and Armco, Inc.

ment is not longer equitable, or because potential relief lies in an independent action in equity.

In reply, the government contends that the Original Generator Defendants have failed to demonstrate mutual mistake of fact going to the essence of the contract since subsurface conditions were known to the Original Generator Defendants, and thus they should not be released from their obligations. The government also argues that cost increases are not extreme, attaching as evidence the affidavit of a private consultant and a letter allegedly containing admissions by the Original Generator Defendants' putative agent, IT Corporation.

A brief review of the pertinent history that brought the parties to this motion is in order. On August 2, 1985, the government and the Original Generator Defendants entered into a "Preliminary Agreement" relating to the implementation of a remedy at the CCC site in Kansas City, Missouri. The remedial action set out in the Preliminary Agreement included specifications for: (1) surface cleanup/surface preparation; (2) a multilayered surface cap; (3) a slurry wall; (4) an interior withdrawal well system; (5) an interior withdrawal well water treatment system; (6) a groundwater monitoring system; and (7) an operation and maintenance program.

The Preliminary Agreement was the subject of a hearing before the Court on October 21, 1985. The primary purpose of the hearing was to determine the appropriateness of the remedy provisions of the Preliminary Agreement. In approving the proposed remedy, the Court found the remedy to be "legal, fair and reasonable." *See, United States v. Conservation Chemical Co.*, 628 F.Supp. 391, 404 (W.D.Mo.1985).

Although the Original Generator Defendants have solicited bids and awarded a contract for the design and implementation of the remedial work, the Original Generator Defendants now contend that geologic investigations suggest that subsurface conditions at the site are materially different from that which the parties had assumed. Since the Original Generator Defendants have not begun to implement the remedy specified by the Preliminary Agreement,

the government has sought to enforce the Preliminary Agreement.

At the outset, a definitional issue not addressed by the parties should be noted. A contract is an agreement between two or more persons which creates an obligation to do or not to do a particular thing. Restatement (Second) of Contracts § 1 (1981). Its essentials are competent parties (Restatement §§ 9–16), subject matter, a legal consideration (Restatement §§ 71–109), and mutuality of agreement and obligation (Restatement §§ 17–70).

■ Whether the Preliminary Agreement can be characterized as a contract is an open question since the Preliminary Agreement contemplates a further, final consent decree and thereby lacks mutuality of agreement. The existing Preliminary Agreement may be no more than an agreement to agree or a manifestation of a willingness to enter into a final agreement. *See, e.g., Dumas v. First Fed. Sav. & Loan Ass'n*, 654 F.2d 359 (5th Cir.1981) (agreement stating on its face that it was subject to later mutually acceptable agreement could only mean parties did not intend agreement to be binding, enforceable contract); *Mitchell v. Hart*, 41 F.R.D. 138 (S.D.N.Y.1966) (agreement to agree lacks the essentials of a binding contract and will not gain enforcement); *Brown v. Childers*, 254 S.W.2d 275 (Mo.App.1953) (there can be no contract without mutual assent of the parties, and there is no mutual assent so long as essential terms are left for future determination). *See also*, Restatement (Second) of Contracts §§ 26 and 27. Thus, no contract exists if either party knows or has reason to know that the other party regards the agreement as incomplete and intends no obligation to exist until other terms are assented to or until the whole has been reduced to another written form.

Beyond the threshold question of whether the Preliminary Agreement is a contract, is the question of whether the rights or obligations thereunder can be enforced in this type of motion rather than an independent, declaratory or plenary contract action. Defendants have not addressed this issue, but the Recommendation, based on

the issues briefed by the parties, makes treatment of these questions unnecessary. Subject to the reservations expressed above, the Preliminary Agreement will be assumed to be a contract between the government and the Original Generator Defendants for purposes of the motion. *United States v. Purcell Envelope Co.*, 249 U.S. 313, 319–320, 39 S.Ct. 300, 301–302, 63 L.Ed. 620 (1919).

The government believes that the relevant provisions of the Preliminary Agreement not only detail the remedy to be implemented at the CCC Site, but also preclude a subsequent attack on or challenge to the reasonableness or the lawfulness of the remedy, its appropriateness for the site, or its consistency with the National Contingency Plan. Furthermore, the government argues that the Original Generator Defendants have "abandoned their efforts to design any of the components to the remedy ... failed to provide initial and final design plans ..., and refused to implement the remedy as set forth in the Agreement" and thus have breached the Preliminary Agreement. *See,* Government's Memorandum, p. 3. The government quotes the Preliminary Agreement in support of its argument that the Original Generator Defendants have bound themselves to implement the remedy outlined in the Preliminary Agreement. *See,* Government's Memorandum, pp. 3–7.

The government argues that under general principles of contract law, a party seeking modification or recission of a contract has the burden of showing clear proof of fraud, mutual mistake of fact or impossibility, citing *J.E. Hathman, Inc. v. Sigma Alpha Epsilon Club*, 491 S.W.2d 261 (Mo. banc 1973); *Southern Agency Co. v. Lasalle Cas. Co.*, 393 F.2d 907 (8th Cir.1968); *Ellis Gray Milling Co. v. Sheppard*, 359 Mo. 505, 222 S.W.2d 742 (1949); and *Stein v. Bruce*, 366 S.W.2d 732 (Mo.App.1963). While this may be an accurate statement of general contract law, it fails to recognize that obligations under a contract arise only when performance is due. *See,* Restatement (Second) of Contracts §§ 224–230 (1981).

Courts seek to ascertain the intent of parties to a contract by giving the language used therein its natural, ordinary and common sense meaning, looking to the entire contract. *Village of Cairo v. Bodine Cont. Co.*, 685 S.W.2d 253 (Mo.App. 1985); *Wilshire Construction Co. v. Union Elec. Co.*, 463 S.W.2d 903, 906 (Mo. 1971). The intent of the parties to a contract must be inferred from the language of the parties, the subject matter of the contract, the surrounding facts and circumstances leading up to the execution of the contract, and the apparent purpose which the parties were undertaking to accomplish. *Press Mach. Corp. v. Smith R.P.M. Corp.*, 727 F.2d 781, 784–785 (8th Cir.1984) (applying Missouri law); *Nika Corp. v. Kansas City, Mo.*, 582 F.Supp. 343, 350 (W.D.Mo.1983) (applying Missouri law); *Kansas City, Missouri v. Kansas City, Kansas*, 393 F.Supp. 1, 4 (W.D.Mo.1975) (applying Missouri law).

This basic rule of construction is contrary to the government's position in two respects. First, as noted previously, the language of the Preliminary Agreement supports the conclusion that the "Preliminary Agreement" is just that: preliminary. Paragraph 4 of the Agreement states that "[t]he settling parties *shall draft a final consent decree....* The clear meaning is that the final agreement of the parties will be embodied in the referenced final consent decree. Until the execution of that document, the parties have only agreed to come to a final agreement.

Even more persuasive, given that the parties assume the existence of a valid contract, are those provisions which serve as conditions precedent to performance. Any promise, whether absolute or conditional, is a sufficient consideration for a contract. *Jump v. Manchester Data Sciences Corp.*, 424 F.Supp. 442 (E.D.Mo. 1976); *Shelton v. M & A Elec. Power Coop.*, 451 S.W.2d 375 (Mo.App.1970). The Original Generator Defendants' performance is subject to conditions. Paragraph 1 of the Preliminary Agreement states:

1. The original generator defendants agree to implement the remedy embodied in Attachment A, attached hereto and incorporated herein (hereinafter "the remedy"), in accordance with the court's

approval pursuant to paragraph 3, together with any other parties to the lawsuit who agree, or are found to be liable, to perform the remedy, after either (1) a settlement has been reached among additional parties (including third-party defendants and insurance carriers), which provides sufficient funds to construct the remedy, or (2) an adjudication by the District Court of all claims for liability among defendants, third-party defendants and insurance carriers, whichever occurs first.

The quoted language makes clear that the Original Generator Defendants' obligation to perform was only to arise *after* the occurrence of *either* of two events: a settlement among additional parties (including third-party defendants and insurance carriers) providing sufficient funds to construct the remedy *or* an adjudication of all claims of liability among defendants, third-party defendants and insurance carriers. Neither has occurred, and thus performance is not due. *O'Neil Lumber Co. v. Allied Builders Corp.*, 663 S.W.2d 326 (Mo.App. 1983); *Juengel Const. Co., Inc. v. Mt. Etna, Inc.*, 622 S.W.2d 510 (Mo.App.1981); Restatement (Second) of Contracts § 224. Condition (1) has not been met. The contemplated settlement with the insurance companies has not been finalized. Even if it was finalized, there are questions as to whether it would provide "sufficient funds to construct the remedy" since it is based on an estimate that all parties now agree is too low. Similary, Condition (2) has not been met. Only CCC, CCCI and Hjersted have been held liable at this point. *United States v. Conservation Chem. Co.*, 619 F.Supp. 162 (W.D.Mo.1985). The liability of the third-party defendants will be determined in a trial.

The government points to the "additional option" provided by the Preliminary Agreement. The government's reason for emphasizing Paragraph 2 is unclear since its present motion is not consistent with the terms of that paragraph. Paragraph 2 of the Agreement states in pertinent part:

2. If either of the conditions set forth in paragraph 1 has not occurred within 18 months from the date of this agreement, the parties agree that the United States, in its sole discretion, may fund part or all of the remedial work described in Attachment A ... The original generator defendants agree not to contest in any subsequent action to recover such expenditures for the remedy described in Attachment A, its appropriateness for the CCC site or its consistency with the National Contingency Plan. The original generator defendants reserve such rights as they may have to contest whether the sums expended by the United States to implement the remedy were reasonable or whether any remedial actions not embodied in Attachment A and taken by the United States at the CCC site are lawful or consistent with the National Contingency Plan.

This paragraph apparently contemplates remediation followed by an action to recover costs in the event the conditions of Paragraph 1 are not met. The government has not acted in its discretion to fund part or all of the remedial work specified in the Preliminary Agreement. They have not instituted any subsequent action to recover such expenditures. The government has not asked for this relief. Because the conditions have not been met, and the government has not funded a remedy, no claim can arise under this provision.

The Original Generator Defendants assert that their contractual obligations could be excused because of impossibility even were such obligations recognized by the Court. The government counters that the Original Generator Defendants have bound themselves not to contest the reasonableness, lawfulness, appropriateness or consistency with the National Contingency Plan of the remedy. *See*, Preliminary Agreement at Paragraph 3.

Missouri recognizes that performance of a contractual obligation may be excused on the ground of impossibility. *Deibel v. Deibel*, 512 F.Supp. 135, 139 (E.D.Mo.1981). Under Missouri law, performance is rendered impossible only by an act of God, the law, or the other party, and unforeseen difficulties, however great, will not serve as an excuse. *Kansas City Term. R. Co. v. Atchinson*, 512 S.W.2d 415 (Mo.App. 1974); *Kansas City, Missouri v. Kansas*

*City, Kansas, supra,* 393 F.Supp. at 6. The doctrine of impossibility has been tempered to some degree by characterizing it as "impracticable." *See,* Restatement (Second) of Contracts, §§ 261–272 (1981). Impracticability may be construed to include an extreme increase in the expense of performance. However, financial difficulties which make it difficult for a defendant to meet its obligations do not in themselves suspend or release contractual duties. *Stein v. Bruce,* 366 S.W.2d 732 (Mo.App. 1963); *Kansas City, Missouri v. Kansas City, Kansas, supra,* 393 F.Supp. at 6. Were the government to obtain a determination that the Preliminary Agreement is binding, the impossibility or impracticability arguments might require consideration. At this juncture, however, the Court has the benefit of only the government's assertions concerning the impossibility of the remedy. *See,* attachments to United States' Reply. Because the conditions precedent to performance have not been met and performance is not due, a decision concerning the impossibility or impracticability of the remedy is unnecessary at this time.

The government's second argument is that because a portion of the Preliminary Agreement was consented to by the parties and approved by an order of the Court, it brings finality to that portion of the case relating to the remedy. The government asserts, without citation of authority, that the Preliminary Agreement is "functionally a partial consent decree," and "is governed by rules concerning enforcement, modification or recession of consent decrees." *See,* Government's Memorandum, p. 11.

Rule 60 reads as follows:

Rule 60, Relief from Judgment or Order

. . . .

(b) MISTAKES; INADVERTENCE; EXCUSABLE NEGLECT; NEWLY DISCOVERED EVIDENCE; FRAUD; ETC. On motion and upon such terms as are just, the court may relieve a party or his legal representative from a *final judgment,* order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2) and (3) not more than one year after the judgment, order or proceeding was also entered or taken. *A motion under this subdivision (b) does not affect the finality of a judgment or suspend its operation.* This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding, or to grant relief to a defendant not actually personally notified as provided in Title 28, U.S.C., § 1655, or to set aside a judgment for fraud upon the court. Writs of coram nobis, coram vobis, audita querela, and bills of review and bills in the nature of a bill of review, are abolished, and the procedure for obtaining any relief from a judgment shall be by motion as prescribed in these rules or by an independent action. (emphasis added).

The Rule by its terms applies to "a final judgment, order or proceeding."

The addition of the qualifying word final emphasizes the character of the judgments, *orders* or proceedings from which Rule 60(b) affords relief; and hence interlocutory judgments are not brought within the restrictions of the Rule, but rather they are left subject to the complete power of the court rendering them to afford such relief from them as justice requires. (emphasis added). (citation omitted).

J. Moore, *Moore's Federal Practice Pamphlet* § 60.1[3], p. 613 (2d ed. 1987). Until a court enters a final decree, it retains jurisdiction to modify or rescind a prior interlocutory order. *Lindsey v. Day-*

ton-Hudson Corp., 592 F.2d 1118 (10th Cir. 1979), cert. denied, 444 U.S. 856, 100 S.Ct. 116, 62 L.Ed.2d 75 (1979). Rule 60(b) will not be applied where an order is not a final judgment within the meaning of the Federal Rules. Gagne v. Carl Bauer Schraubenfabrick, GmbH, 595 F.Supp. 1081 (D.Me.1984). A consent decree, however, is a final judgment and entitled to a presumption of finality. Delaware Valley Citizens Council for Clean Air v. Commonwealth of Pennsylvania, 674 F.2d 976 (3rd Cir.1982), cert. denied 459 U.S. 905, 103 S.Ct. 206, 74 L.Ed.2d 165 (1982).

The government's assertion that the Order of December 12, 1985 is "functionally a partial consent decree" ignores the fact that the Preliminary Agreement and the Court's Order contemplate further action. Each contemplates execution and approval of a final consent decree. No amount of discussion concerning the procedural requirements for obtaining relief from an order under Rule 60 or case law concerning the standards for modification of a consent decree or impassioned argument can alter the plain fact that no final consent decree exists or has been approved. Rule 60, Fed. R.Civ.P., simply cannot and does not apply.

Prior to the hearing on October 21, 1985, concerning the Preliminary Agreement, the Court drew upon its authority under Rule 42, Fed.R.Civ.P., to call up for trial issues relating to the appropriateness of remedy. United States v. Conservation Chem. Co., 628 F.Supp. 391, 404 (W.D.Mo.1985). Rule 42 allows a court to order a separate trial "of any separate issue" when it will be "conducive to expedition and economy." The Court used its Rule 42 authority "in order to avoid relitigating these issues." United States v. Conservation Chem. Co., supra, 628 F.Supp. at 404. But this is not dispositive as to whether there is a final decision when the exercise of this authority was never fully or completely carried out. A final decree is one that finally adjudicates upon the entire merits, leaving nothing to be done except its execution. Stringfellow v. Concerned Neighbors in Action, —— U.S. ——, 107 S.Ct. 1177, 94 L.Ed.2d 389 (1987). The December 12, 1985 Memorandum Order does not meet the test of finality in its contemplation of a consent decree and further court action: "... the parties will proceed to prepare a final consent decree for consideration by the Court and final approval." United States v. Conservation Chem. Co., supra, 628 F.Supp. at 399.

In discussing the government's publication of the Preliminary Agreement in the Federal Register in order to comply with Justice Department regulations, the Court distinguishes "a final consent decree" and "an agreement of the type represented by the Preliminary Agreement." 628 F.Supp. at 399. The Court expressly directed the parties to "prepare forthwith a consent decree incorporating the approved remedy for consideration by the Court after a hearing on the full consent decree...." 628 F.Supp. at 404. Finally, the Court ordered plaintiff and the settling defendants to prepare a full and final consent decree for review by the Court. 628 F.Supp. at 409. That the Court contemplated further action is beyond dispute. The remedy provisions of the Preliminary Agreement can not be construed as a partial consent decree, "functional or otherwise."

The Special Master declines to address the Rule 60(b) arguments regarding relief from judgments or orders, and the issues of whether a slurry wall remedy is favored under the National Contingency Plan or CERCLA/SARA. Similarly, the Original Generator Defendants' request that the Court modify the Preliminary Agreement by substituting "pump and treat" technology is untimely and not properly before the Court, and thus will not be addressed. Those issues must be resolved after the evidentiary hearing scheduled for June 22, 1987.

In summation, the Special Master believes that even assuming a contract exists (as is apparently assumed or conceded by the parties), the conditions precedent to the Original Generator Defendants' performance have not occurred, and performance therefore is not due. The Special Master also believes that the December 12, 1985 Order of the Court cannot be construed as a "functional consent decree" or a final order such that a barrier to relief from the Order would arise except pursuant to the provisions of Rule 60(b), Fed.R.Civ.P.

The Special Master therefore recommends that the plaintiff's Motion to Enforce the Preliminary Agreement be *denied.*

## II. JURISDICTION.

█ The Special Master's Thirtieth Set of Recommendations Concerning Pretrial Matters posed six questions. The second question was:

(B) If the parties and the Court are not bound by the remedy contained in the Preliminary Agreement, how is the remedy to be determined?

In response to this second question, the government argues:

If the court rules that the Preliminary Agreement cannot be enforced or should be substantially modified, the EPA would proceed to select a remedy to be taken by the Government or secured by order of the court in this litigation. If the EPA were required to select a remedy not specified in the Preliminary Agreement, its determination of a remedy some six months or more after the amendments to CERCLA[8] is clearly bound by the cleanup standards of section 121 of CERCLA as well as the procedural requirements

of sections 113 and 117 of that Act. That determination is entitled to the presumption of regularity and judicial deference[9] mandated by prior case law and the language and legislative history of Section 113 of the Act.

The United States maintains that the correct standard of review of federal response action decisions under either sections 104 or 106 of the Comprehensive Environmental Compensation and Liability Act ("CERCLA"), either before or after the 1986 amendments, is whether EPA's decision to take or secure a specific response action is "arbitrary and capricious." The United States further maintains that judicial review of determinations relating to the selection of a response action is limited to the administrative record on which the government based its decision to authorize or require such action.

United States Memorandum of Law Concerning Judicial Review of Issues Relating to Remedy Selection at 2–3. Stated differently, after more than five years[10] of searching for a judicial remedy under Section 106(a) of CERCLA,[11] the government now intends to implement an administrative

---

**8.** The Superfund Amendments and Reauthorization Act of 1986 ("SARA"), Pub.L. No. 99–499, 100 Stat. 1613 (1986). SARA was enacted October 17, 1986.

**9.** Section 113(j) was added to CERCLA by Section 113(c) of SARA.

**10.** The litigation began five years ago with the government requesting the Court to determine a remedy and enter a mandatory injunction requiring responsible parties to implement that remedy. The Court has already heard evidence and made findings concerning conditions at the CCC Site. The Court has found, among other things, that the CCC Site poses an imminent and substantial endangerment to the public health, welfare or the environment within the meaning of 42 U.S.C. § 6973 and 42 U.S.C. § 9606. *United States v. Conservation Chem. Co.*, 628 F.Supp. 391, 402 (W.D.Mo.1985). Each year, 22,000 pounds of hazardous materials are being discharged into the groundwater and migrating to the Missouri River. *Id.* 628 F.Supp at 398. Indeed, based on data contained in the Original Generator Defendants' RI report, each day that a remedy is delayed results in the release of at least 80,000 to 100,000 gallons of contaminated water. *See,* Government's Reply, p. 42. Implementation of a remedy at the CCC Site has already been delayed longer than is provident

while the parties have attempted to consensually resolve details. Now the government wants to start over on an administrative track. The quickest resolution of these issues will result from the Court's retention and exercise of its jurisdiction. It is too late in the day for any other course. The Special Master does not believe that Congress intended to divest federal district courts of their traditional equitable powers especially in cases such as the present one where the Court is on the threshold of determining a remedial action "as the public interest and equities ... may require." 42 U.S.C. § 9606(a).

**11.** The government has not proposed to dismiss its pending CERCLA Section 106(a) action in favor of proceeding with an administrative action as it has done in other cases. *See, e.g., United States v. Outboard Marine Corp.*, 104 F.R.D. 405, 407 (N.D.Ill.1984), *aff'd,* 789 F.2d 497 (7th Cir.), *cert. denied,* — U.S. ——, 107 S.Ct. 457, 93 L.Ed.2d 403 (1986) (Voluntary dismissal of ongoing Sec. 106(a) CERCLA action so as to implement cleanup financed by Superfund followed by cost recovery suit); *United States v. Western Processing Co.*, No. C–83–252M (W.D. Wash. Feb. 19, 1986) [Available on WESTLAW, DCT database] (Superfund cleanup under Section 104 elected instead of CERCLA § 106(a)

remedy [12] which it insists can only be reviewed under an arbitrary and capricious standard based upon the administrative record. According to the government, the use of administrative action as well as the limited scope of review are mandated by section 113(j) of CERCLA/SARA [13] and well-established principles of administrative law. The government contends that Section 113(j) of CERCLA/SARA applies to *any* action [14] under the Act including those, such as the instant one, which were pending as of the date SARA was enacted [15] (United States' Memorandum, pp. 6–17 and 26–30), thus divesting [16] courts of authority to fashion a remedy in place of EPA's remedy selection. According to the government:

> Section 121(a) of SARA confirms that EPA, not the courts, "shall select appro-

injunction action). In the present case, the government apparently wishes to maintain its Section 106(a) CERCLA action, but reduce the Court's function under Section 106(a) from decisionmaker to reviewer of EPA's administrative action.

**12.** *See,* EPA's letter of March 26, 1987, advising counsel of EPA's initiation of public notice and comment procedures under Section 117 of CERCLA/SARA. The government has not, however, certified an administrative record to the Court.

**13.** Section 113(j) of CERCLA/SARA provides:
(j) Judicial Review
(1) Limitation.—*In any judicial action under this Act, judicial review of any issues concerning the adequacy of any response action taken or ordered by the President shall be limited to the administrative record.* Otherwise applicable principles of administrative law shall govern whether any supplemental materials may be considered by the court.
(2) Standard.—In considering objections raised in any judicial action under this Act, *the court shall uphold the President's decision in selecting the response action unless the objecting party can demonstrate, on the administrative record, that the decision was arbitrary and capricious or otherwise not in accordance with law.*
(3) Remedy.—If the court finds that the selection of the response action *was not arbitrary and capricious or otherwise not in accordance with law, the court shall award* (A) only the response costs or damages that are not inconsistent with the National Contingency Plan, and (B) such other relief as is consistent with the National Contingency Plan.
(4) Procedural Errors.—In reviewing alleged procedural errors, the court may disallow costs or damages only if the errors were so serious and related to matters of such central relevance to the action that the action would have been significantly changed had such errors not been made. (emphasis added).

**14.** Section 113(j) of CERCLA/SARA pertains to any "judicial actions" under the Act for judicial review of any issues concerning the adequacy of

any response action (defined in Section 101(25)) ordered by the President.

**15.** Because Section 113(j) contains no time limitation as to its effective date as do Sections 113(g)(1) and 121(b), and because Section 113(j) applies to "any judicial action under this Act" without regard to when it was filed, the government contends that by virtue of Section 4 of SARA, Section 113(j) took effect on October 17, 1986. The government therefore argues that SARA must be applied retroactively.

**16.** Section 106(a) of CERCLA/SARA empowers the Attorney General to secure such relief as may be necessary to abate danger or threat [to the public health, welfare or environment because of an actual or threatened release of a hazardous substance] and specifically provides that the:

> *district court* of the United States in the district in which the threat occurs *shall have jurisdiction* to grant relief as the public interest and the equities of the case may require. (emphasis added).

*See also, United States v. Conservation Chem. Co.,* 106 F.R.D. 210, 214–16 (W.D.Mo.1985); *United States v. Vertac Chem. Corp.,* 588 F.Supp. 1294, 1295 (E.D.Ark.1984). Furthermore, the government's position apparently ignores Sections 113(d) and 113(h)(5) which grant federal question jurisdiction to district courts in actions in which the United States has sought to compel a remedial action.

Section 113(j) of CERCLA/SARA does not, of course, apply to actions brought under § 7003 of the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. § 6973. There are no reported cases where a court has limited its review of a RCRA § 7003 claim to an administrative record. Instead, courts have consistently decided RCRA § 7003 claims in a traditional trial after full discovery. *See, e.g., United States v. Waste Ind., Inc.,* 734 F.2d 159 (4th Cir.1984); *United States v. Price,* 688 F.2d 204, 208–215 (3rd Cir.1982); *United States v. Vertac Chem. Corp.,* 489 F.Supp. 870, 873 (E.D.Ark.1980). At least one court has held that the inclusion of a RCRA § 7003 claim with CERCLA/SARA claims defeats any attempt to refer the case to EPA for administrative action. *See, United States v. Hardage,* 25 Env'tl Rep. (BNA) 1343, 1345 (W.D.Okla. Dec. 11, 1986).

priate remedial actions necessary to be carried out under Section 104[17] or secured under Section 106[18].

United States' Memorandum at 13.

Thus, in summary, the government claims that because of the SARA amendments to CERCLA, EPA is now free to select a remedy for the CCC Site, free of the Court's originally invoked equity jurisdiction under Section 106(a) of CERCLA, and any subsequent judicial challenge to the adequacy of EPA's chosen response must be governed by the "arbitrary and capricious" administrative review standard now found in Section 113(j) of CERCLA/SARA.

In opposition to the government's argument, the Original Generator Defendants argue that the remedy for the CCC Site should be determined by the Court exercising its full equitable powers. According to the Original Generator Defendants, this result is required because: (1) two district court decisions[19] subsequent to SARA's enactment rejected the very same arguments[20] advanced by the government in the present case; (2) SARA does not divest a court of its equitable jurisdiction under Section 106(a) of CERCLA; (3) the adminis-

---

**17.** Under Section 104 of CERCLA/SARA, 42 U.S.C. § 9604, the President or his designee (EPA) may use monies from the Superfund to investigate, determine the remedial action, and remedy the site. *See, e.g., United States v. Wade,* 577 F.Supp. 1326 (E.D.Pa.1983); *United States v. Reilly Tar & Chem. Co.,* 546 F.Supp. 1100 (D.Minn.1982). Where the remedial action carried out by EPA is not inconsistent with the National Contingency Plan (42 U.S.C. § 9605, Section 105 of CERCLA), the EPA may bring suit to recover the monies expended under CERCLA Section 107, 42 U.S.C. § 9607. *See, e.g., United States v. Northeastern Pharmaceutical & Chem. Co.,* 810 F.2d 726 (8th Cir. 1986). In pursuing the process of selection and remediation, the EPA is obliged to follow administrative procedures in the National Contingency Plan ("NCP") required by Section 105 of CERCLA, 42 U.S.C. § 9605, and found at 40 C.F.R. § 300 *et seq. J.V. Peters & Co., Inc. v. Ruckelshaus,* 584 F.Supp. 1005 (N.D.Ohio 1984), *aff'd,* 767 F.2d 263 (6th Cir.1985). EPA is not required to provide a full hearing on the record prior to issuing the administrative order under Section 106(a); however, in any subsequent action to enforce the administrative order or to seek penalties for violation of the administrative order, the adequacy and appropriateness of EPA's remedial action are at issue. Also under Section 106(a), 42 U.S.C. § 9606(a), the EPA may seek equitable relief from a federal district court to abate any imminent and substantial endangerment to health, welfare or the environment that an actual or threatened release of a hazardous substance may present. *See, e.g., United States v. Conservation Chem. Co.,* 619 F.Supp. 162, 184–191, 204–213 (W.D.Mo.1985).

**18.** Under Section 106(a) of CERCLA/SARA, 42 U.S.C. § 9606(a), the EPA may issue an administrative order to specific parties requiring them to undertake an investigation of the site, and to perform specified cleanup activities.

**19.** *United States v. Hardage,* 25 Env't Rep. (BNA) 1343 (W.D.Okla. Dec. 11, 1986) [Available on WESTLAW, DCT database]; *United States v. Ottati & Goss,* No. 80–225–L (D.N.H. Nov. 14, 1986), *petition for mandamus dism'd,* No. 87–1003 (1st Cir. Feb. 4, 1987).

**20.** In *United States v. Hardage,* the government sought a protective order to limit the scope of examination of various EPA contractors on the theory that because SARA restricts judicial review of issues related to the appropriate remedy, defendants were not entitled to discovery beyond the administrative record developed by EPA. The court denied the government's motion holding that Section 113(j) did not apply in actions for mandatory relief under Section 106(a) of CERCLA/SARA where EPA did not follow an administrative process to implement a remedy, but rather EPA's only action was filing the § 106 action thereby placing adjudication of all issues under the court's jurisdiction. The court also noted that Section 113(j) did not affect actions for mandatory injunction under § 7003 of RCRA.

In a well-reasoned and carefully written twenty-two page Order dated April 9, 1987, the Court rejected virtually all of the arguments advanced by the government here in denying a "Motion for Reconsideration and Modification of the Order of the Court Dated December 11, 1986." In particular, the Court, after consideration of CERCLA and SARA, interpreted the applicable sections to allow *de novo* review of EPA's proposed remedy. The Court similarly held that Section 113(j) of SARA was inapplicable because retroactive application was improper, although even if retroactive application were to apply, it would not affect the scope of review issues as Section 113(j) simply does not apply to actions commenced by the government under CERCLA Section 106(a) to obtain a mandatory injunction. (Order at 4). *United States v. Hardage,* CIV–86–1401–W (W.D.Okla. April 9, 1987).

In *United States v. Ottati & Goss,* the trial judge ruled from the bench that its review of damages was not limited to the administrative record. The Court of Appeals for the First Circuit denied the government's petition for writ of mandamus.

trative record review provisions of SARA cannot be applied retroactively; (4) the record review provision enacted by SARA are inappropriate where the government has sought mandatory injunctive relief under § 7003 of RCRA; and (5) SARA did not amend Section 106 of CERCLA, which requires a full trial where mandatory injunctive relief is sought. (Original Generator Defendants' Memorandum, pp. 8–24). Similarly, third-party defendant Midland-Ross Corporation argues that the Court must independently fashion an appropriate site remedy, and that the limited review adopted by Section 113 of SARA is violative of the due process clause of the Fifth Amendment and therefore unconstitutional.

This Court has jurisdiction to determine whether the EPA, by initiating an administrative process on the remedy decision, can divest the court of its equity jurisdiction. "It is well-settled that federal courts always have jurisdiction to determine jurisdiction." *Smith v. Armontrout*, 604 F.Supp. 840, 842 (W.D.Mo.1984). *See also, United States v. United Mine Workers*, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947); *Dracos v. Hellenic Lines, Ltd.*, 762 F.2d 348 (4th Cir.1985) *cert. denied,* —— U.S. ——, 106 S.Ct. 311, 88 L.Ed.2d 288; *Ilan-Gat Engineers, Ltd. v. Antigua International Bank*, 659 F.2d 234 (D.C.Cir. 1981); *Industrial Park Development Co. v. E.P.A.*, 604 F.Supp. 1136 (E.D.Pa.1985); Wright, Miller & Cooper, *Federal Practice and Procedure:* Jurisdiction 2d § 3536 (2d ed. 1984). This jurisdiction is limited only by the requirement that advisory opinions on moot issues not be rendered. *City of New York v. Pierce*, 609 F.Supp. 798 (S.D. N.Y.1985). A federal court's error in a determination of its jurisdiction will not render a judgment void unless the judgment is a clear usurpation of the court's power. *Brazosport Towing Co., Inc. v. 3,838 Tons of Sorghum*, 607 F.Supp. 11 (S.D.Tex.1984).

Thus, it is clear that the Court has the authority to come to its own conclusion—the jurisdiction to determine jurisdiction in the face of the government's contention that the Court's jurisdiction can be ousted by the EPA's action. For the reasons hereafter stated, the Special Master believes the Court's jurisdiction to proceed can not be disturbed and the CERCLA Section 106(a) action should proceed.

In order to determine this jurisdictional issue, a brief review of the present action is in order. On November 22, 1982, the United States filed the present action against CCC, CCCI, Norman B. Hjersted and the Original Generator Defendants. In general terms, the government is seeking reimbursement of response costs as well as an injunction directing defendants to remedy environmental endangerment at the CCC Site. The Complaint asserts claims pursuant to 42 U.S.C. § 6973, Section 7003 of the Resource Conservation and Recovery Act ("RCRA"),[21] and 42 U.S.C. §§ 9604, 9606 and 9607(a), Sections 104, 106 and 107 of CERCLA[22] *See, United States v. Conservation Chem. Co.*, 619 F.Supp. 162 (W.D. Mo.1985).

Of the possible courses for determining a remedial action pursuant to CERCLA, the government has chosen to seek mandatory injunctive relief pursuant to Section 106(a) of CERCLA to compel defendants to take remedial action at the Site. The government has not itself taken or funded remedial action at the Site. The question is whether the government's initiation of administrative action under Section 117 of CERCLA/SARA divests the Court of its equitable jurisdiction by confining the Court to a role of reviewing specific agency action.

The government came to this Court seeking equitable relief, and invoked this Court's equitable powers under CERCLA Section 106(a). In *Porter v. Warner Holding Co.*, 328 U.S. 395, 397–98, 66 S.Ct. 1086, 1088–89, 90 L.Ed. 1332 (1946), the Supreme Court said:

[T]he Administrator invoked the jurisdiction of the District Court to enjoin acts

---

21. The First and Second Claims for relief cite Section 7003 of RCRA for their bases. The First Claim seeks injunctive relief while the Second Claim is for restitution. (¶¶ 38 through 52).

22. The Third and Fourth Claims rest upon Sections 106, 104 and 107 respectively of CERCLA, and seek injunctive and reparative relief. (¶¶ 53–74).

and practices made illegal by the [Emergency Price Control] Act and to enforce compliance with the Act. Such a jurisdiction is an equitable one. Unless otherwise provided by statute, all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction. And since the public interest is involved in a proceeding of this nature, those equitable powers assume an even broader and more flexible character than when only a private controversy is at stake. [Citation omitted]. Power is thereby resident ... "to do equity and to mould each decree to the necessities of the particular case." [Citation omitted]. It may act so as to accord full justice ... [T]he court may go beyond the matters immediately underlying its equitable jurisdiction and decide whatever other issues and give whatever other relief may be necessary under the circumstances.

Given the government's original and ongoing request for equitable action, and the broad and flexible nature of the Court's equitable power (particularly where the public interest and welfare are involved), the Court may not assume the confined review posture now advocated by the government.

The government cites *Porter* for the proposition that the Court's equity jurisdiction is not unfettered:

Moreover, the comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command. Unless a statute in so many words or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full

scope of that jurisdiction is to be recognized and applied.

*Porter* 328 U.S. at 398, 66 S.Ct. at 1089. The Special Master agrees that equitable powers are not "unfettered," but does not believe that SARA contains a clear and valid legislative command or a necessary and inescapable inference that the Court's equitable powers be limited in the present case. On the contrary, because Congress did not disturb the language of CERCLA Section 106, CERCLA/SARA recognizes the inherent equitable power of courts to "grant such relief as the public interest and the equities of the case may require."

The Supreme Court has held that "Congress should not lightly be assumed to have enacted a statutory scheme foreclosing a court of equity from the exercise of its traditional discretion." *United States v. Rodgers*, 461 U.S. 677, 708, 103 S.Ct. 2132, 2150, 76 L.Ed.2d 236 (1983). To demonstrate a restriction on traditional equitable power, a clear legislative intent must be identified in the language of the statute or in valid legislative command. *CIA Petrolera Caribe, Inc. v. ARCO Caribbean, Inc.*, 754 F.2d 404, 416 (1st Cir. 1985).[23] The legislative history of SARA quoted by the government does no more than define the extent of the toxic waste problem; it makes no reference to the equitable jurisdiction of federal district courts. Acknowledging that jurisdiction may be limited or defined by statute and that there is a necessary interplay between the judiciary and agencies does not lead to the conclusion now urged by the government.[24] The provision of SARA relied on by the government as limiting the court's

---

**23.** Because of the vital role of equity in our system of law,

"this equitable jurisdiction *is not to be denied or limited in the absence of a clear and valid legislative command.* Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied. 'The great principles of equity, securing complete justice, should not be yielded to light inferences, or doubtful construction.' *Brown v. Swann*, 10 Pet. 497, 503 [9 L.Ed. 508]"

*Weinburger v. Romero-Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982)

(quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 398, 66 S.Ct. 1086, 1089, 90 L.Ed. 1332 (1946) (emphasis original); *see also, Avery v. Secretary of Health and Human Services*, 762 F.2d 158 (1st Cir.1985).

**24.** *See, Hecht v. Bowles*, 321 U.S. 321, 329, 64 S.Ct. 587, 591, 88 L.Ed. 754 (1944) (If Congress had intended to make a drastic departure from the traditions of equity practice, an unequivocal statement of its purpose would have been made). *See also,* 1 Pomeroy, *Equity Jurisprudence* §§ 42a and 282 (5th ed. 1941).

equitable jurisdiction reads in pertinent part:

(j) Judicial Review.—

(1) Limitations—In any action under this Act, judicial review of any issues concerning the adequacy of any *response action taken or ordered by the President* shall be limited. . . .

(2) Standard.—In considering objections raised in any judicial action under this Act, the court shall uphold the President. . . .

CERCLA/SARA Section 113(j). (emphasis added).

This section, referring as it does to "response action taken or ordered by the President" is clearly distinguishable from the situation where a court exercises its equitable jurisdiction because of an action brought by a plaintiff requesting equitable relief. Section 113(j) clearly distinguishes between judicial review of the President's selection of such actions and judicial review of proposed remedies for sites which EPA asks a court to make defendants implement. Judicial review is not limited to the administrative record in the latter case. *See, United States v. Hardage,* 663 F.Supp. 1280, 1284 (W.D.Okl.1987).

Not only is the Court's equitable jurisdiction not limited by the language of SARA Section 113(j), but "where the agency chooses to go to district court for enforcement, it makes little sense to refer the very question at issue back to the agency." *C.A.B. v. Aeromatic Travel Corp.,* 489 F.2d 251, 254 (2d Cir.1974). *See also, I.C.C. v. B & T Transportation Co.,* 613 F.2d 1182, 1187 (1st Cir.1980). In *Aeromatic,* the Circuit Court reversed a trial court order staying proceedings at the behest of the defendants who invoked "primary jurisdiction" to have their case heard by the C.A.B. While it is the government

which wishes to revert to administrative proceedings, the logic is persuasive: the government should not decide the very issue it brought before the court.

"The doctrine of primary jurisdiction . . . is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties . . . [and] comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body. . . ." *United States v. Western Pac. R. Co.,* 352 U.S. 59, 63–64, 77 S.Ct. 161, 164–165, 1 L.Ed.2d 126 (1956). The government cannot, however, rely on primary jurisdiction since CERCLA Section 106(a) clearly grants the district court jurisdiction to fashion equitable relief. The resolution of issues such as the proper remedy at the CCC Site have not been placed exclusively with EPA under CERCLA/SARA, therefore the Court has no obligation to stay proceedings pending agency action. Furthermore, the doctrine of primary jurisdiction has no application where the very institution of suit represents the exercise of EPA's special competence. *See, e.g., I.C.C. v. Maine Central R. Co.,* 505 F.2d 590 at 594 (2d Cir.1974) (doctrine of primary jurisdiction does not apply where agency is the plaintiff); *United States v. Open Bulk Carriers, Ltd.,* 465 F.Supp. 159, 162 (S.D.Ga.1979) (filing the action constituted an exercise of agency's expertise and to remand would create unnecessary delay; when settlement fails, the agency is not entitled to stay proceeding and renew investigation).

CERCLA Section 106(a) provides options to the government: the option chosen here in the exercise of its competence was to bring an action in the district court.[25] After more than five years of litigation, it would be inequitable[26] to limit the Court's equitable jurisdiction.

**25.** It must be borne in mind that the EPA's "exercise of expertise" resulted in the filing of the present action in district court. The government did not wish to remediate the site through its own cost and then to recover the response costs from those liable. The government desired to obtain a judicial remedy because it was concerned with its exposure to unknown costs as well as the uncertain liability of any given

party. That it is now more confident does not negate the Court's authority to act under its equitable powers to determine a remedy.

**26.** Contrary to the government's assertions that the Original Generator Defendants could not have reasonably relied on pre-SARA precedents allowing them a trial on the merits, the Special Master believes that the Original Generator De-

In addition to its contention that EPA may now alter its course and pursue a remedy through administrative procedure, the government argues that CERCLA/SARA Section 121 *requires* the EPA to make remedy selection decisions. Section 121(a) reads as follows:

(a) The President *shall select the appropriate response actions to be carried out under section 104 or secured under section 106* which are in accordance with this section and, to the extent practicable, the national contingency plan, and which provide for cost effective response. (emphasis added).

The government's argument ignores the plain language of Section 121 as it relates to Section 106. Section 121 gives the President authority in actions carried out under Section 104 and actions *secured* under Section 106. Relief "secured" under Section 106 by the Attorney General is distinct from relief granted under Section 106 by a district court pursuant to its equity jurisdiction, *i.e.,* relief granted by the court as the public interest and the equities require. Relief "secured" refers to court action sought by the government to effectuate an administrative disposition made prior to the litigation.

Section 121(a) of SARA is not a clear statement of limitation as would be required to effectuate a limitation on the court's equitable powers. Therefore, neither the statute nor traditional views of a court's exercise of equitable powers at the instigation of administrative agencies requires this Court to limit its role in deciding on remedial action at the CCC Site.

As has been noted, the government has not effectuated a cleanup, either by EPA using Superfund monies or issuing an order in the context of an administrative ac-

tion. The fact that the government has not taken, funded, ordered or reached agreement on remedial action is the critical distinction between the government's contentions and the cases cited by the government in support of their view of the appropriate level of judicial review.

For example, in *United States v. Northeastern Pharmaceutical & Chem. Co.,* 810 F.2d 726 (8th Cir.1986) (hereinafter "NEPACCO"), the government had, between the time of discovery of improper disposal in October, 1979, and its initial complaint under RCRA in August, 1980, investigated the site, prepared a plan for cleanup, installed a temporary cap and contracted for a cleanup feasibility study. *NEPACCO,* 810 F.2d at 730. Prior to filing an amended complaint by adding counts under CERCLA, the government negotiated with and entered into a settlement agreement remediation. *Id.* Thus, the Court was asked to order reimbursement of response costs where remediation was underway and perhaps substantially completed.

This is clearly distinguishable from the factual context in the present case where the government has come to the Court seeking a plan and injunction for a remedy, and with the parties wavering between "imminent settlement" and being millions of dollars apart.[27] Similarly, distinguishable factually are: *United States v. Ward,* 618 F.Supp. 884 (E.D.N.C.1985) (United States seeks *reimbursement under Section 107(a) of funds spent* in cleaning up hazardous substances); and *United States v. Western Processing Co.,* No. C 83–252M (W.D.Wash. Feb. 19, 1986) [Available on WESTLAW, DCT database] (remedy *chosen* and *implemented* by EPA under Section 104 reviewed *on the basis of the administrative record* for arbitrary and capricious).

fendants could well have relied upon the Court's orders to establish their right to trial. *See, United States v. Conservation Chem. Corp.,* 106 F.R.D. 210, 214–216 (W.D.Mo.1985).

**27.** It is ironic that the government originally came into this Court advocating a "pump and treat" remedy for the CCC Site subject to monitoring and performance standards. Now the government, on one hand, is asking the Court to enforce the Preliminary Agreement which calls

for an entirely different remedy involving construction of slurry walls and caps; while, on the other, it desires to begin the remedy determination process anew under administrative action. Since the government is unable to determine the most effective remedy for the CCC Site and further has not determined the exclusive remedy, the equity jurisdiction of the Court is even more appropriate and needed to decide remedial action to protect the public interest.

While an arbitrary and capricious standard may be appropriate where an EPA cleanup plan exists and expenditures are supported by an adequate administrative record, here there is no plan, no expenditures on a remedy, and no EPA administrative record. It is impossible to utilize an arbitrary and capricious standard of review when no action on an administrative decision exists. *See, United States v. Hardage*, 25 Env'tl. Rep. (BNA) 1343, 1345 (W.D.Okla. Dec. 11, 1986), *reh'g denied*, (Order, April 9, 1987).

Finally, the government cites CERCLA/SARA Section 122(e)(6) as requiring that the President approve any remedial action before it may be implemented by a potentially responsible party. The Section reads:

> When either the President, or a potentially responsible party pursuant to an Administrative Order or consent decree under this Act, has initiated a Remedial Investigation and Feasibility Study for a particular facility under this Act, no potentially responsible party may undertake any remedial action at the facility unless such remedial action has been authorized by the President.

Since the Remedial Investigation and Feasibility Study completed for the CCC Site were not done "pursuant to an Administrative Order or consent decree," this section cannot apply by its own terms. Section 122(e)(6) therefore does not serve to disturb the court's jurisdiction to order remediation of the CCC Site.

Based upon the foregoing, the Special Master believes that the 1986 Amendments to CERCLA (SARA) do not divest federal district courts of equity jurisdiction in CERCLA Section 106(a) actions.

In 1982, the government invoked the jurisdiction of this Court under Sections 106 and 107 of CERCLA and Section 7003 of RCRA to remedy what it alleged to be violations of those provisions. This Court and others have held that actions under CERCLA § 106 and RCRA § 7003 involve the equity jurisdiction of the Court. *United States v. Conservation Chem. Co.*, 619 F.Supp. 162, 204–206 and 212–213 (W.D. Mo.1985). Determination of the relief required to abate the danger or threat of danger to the public from the CCC Site, including the appropriate remedy, rests solely within the province of the Court in the exercise of its equitable powers. The government has taken no action to dismiss or otherwise terminate the Court's equitable jurisdiction which it invoked pursuant to CERCLA and/or RCRA, and no provision of SARA clearly or validly commands that the Court divest itself of or limit the equity jurisdiction invoked by the government upon the filing of the present action under CERCLA and RCRA. Therefore, the Special Master recommends that the government's pending claims for mandatory relief under RCRA Section 7003 and CERCLA Section 106(a) be resolved by the Court utilizing its full equitable powers.

The Special Master makes no recommendation as to *de novo* review of EPA actions, burden of proof, or the authority of the Court to enjoin EPA action. Each of these matters is deemed to be beyond the scope of issues noticed before the Court.

The Special Master further recommends that the parties be granted five (5) days from the actual filing of this Recommendation with the Court to file objections since the schedule adopted by the Court on March 6, 1987 would allow fewer days to so file.